**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| MAGNA ENTERTAINMENT CORP., et al., | ) Case No. 09-10720 (MFW) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| _____ | ) |
| | ) |
| REDROCK ADMINISTRATIVE SERVICES LLC, RACING AND GAMING SERVICES, LTD., AMWEST ENTERTAINMENT, LLC, BETTOR RACING, INC. D/B/A ROYAL RIVER RACING, AND THE ELITE TURF CLUB, N.V., | ) ) ) ) Adv. Proc. No. 09-51155 (MFW) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MAGNA ENTERTAINMENT CORP., PACIFIC RACING ASSOCIATION, INC., MEC LAND HOLDINGS (CALIFORNIA), INC., GULFSTREAM PARK RACING ASSOC., INC., LOS ANGELES TURF CLUB, INC., AND THE SANTA ANITA COMPANIES, INC., | ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**MEMORANDUM OPINION[1]**

Before the Court is the Defendants' Motion for an Order

Dismissing the Second Amended and Restated Complaint (the

---

[1] The Court is not required to state findings of fact or conclusions of law when ruling on a motion under Rule 12 of the Federal Rules of Civil Procedure made applicable to the adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court makes no findings of fact and conclusions of law but accepts the facts as averred in the Complaint.

"Complaint") filed by Redrock Administrative Services LLC, Racing and Gaming Services, LTD., Amwest Entertainment, LLC, Bettor Racing, Inc., d/b/a Royal River Racing, and the Elite Turf Club, N.V. (collectively the "Simulcast Sites").  For the reasons stated below, the Court will grant the Motion in part and deny it in part.

I.   <u>BACKGROUND</u>

Magna Entertainment Corp., Pacific Racing Association, Inc., MEC Land Holdings (California), Gulfstream Park Racing Association, Inc., Laurel Racing Assoc., Inc., Los Angeles Turf Club, Inc., and the Santa Anita Companies, Inc., (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on March 5, 2009 (the "Petition Date").

As of the Petition Date, the Debtors owned and operated various horse racetracks throughout North America.  The racetracks at issue in this proceeding are Santa Anita Park, Golden Gate Fields, Gulfstream Park, the Meadows, and Laurel Park (collectively, the "Host Tracks").

Pari-mutuel wagering is an authorized form of gambling under federal and state law.  In pari-mutuel wagering, the bettors do not bet against the track; rather, they bet against each other. The Simulcast Sites accept pari-mutuel wagers from their customers on races run at the Host Tracks, which are telecast

2

simultaneously to the Simulcast Sites.  As a result, the
Simulcast Sites' customers are able to place wagers on races run
at the Host Tracks without having to appear there in person.  The
Debtors pay winning bettors who bet at the Host Tracks; the
Simulcast Sites pay winning bettors who bet at their respective
off-track locations.

     The Debtors facilitate pari-mutuel wagering at the Host
Tracks and at off-track betting facilities including the
Simulcast Sites until the start of the race, at which time a
pari-mutuel pool is created.  Multiple pari-mutuel pools are
created for each race.  Each wager type (e.g., a "Win" or
"Exacta" wager) has its own pari-mutuel pool.  Unlike fixed-odds
wagering, the final payout in pari-mutuel wagering is not
determined until the pool is closed.  At the conclusion of each
race, final odds and prices are posted for each pool based on the
total net volume wagered divided by the number of winning
selections and rounded down to the nearest statutory break point.
Then a "money room settlement" is generated for each pool, which
documents the total wagers accepted (the "Handle"), the takeout
fees, and the amount due to the winning bettors.

     For each pari-mutuel pool, the Host Track is authorized to
deduct a takeout fee for its services in accepting and
administering the wagers placed at the Host Tracks and for
hosting the horse race.  The Simulcast Sites conduct a similar

3

but separate procedure at their locations and are also entitled
to deduct a takeout fee for their services.

The relationship between the Simulcast Sites and the Debtors
is governed by written contract, pursuant to which the Debtors
and the Simulcast Sites reconcile their separate money room
settlements either on a monthly basis or at the end of each meet
held at the Host Track.  At the time of reconciliation, the
Debtors may owe money to the Simulcast Sites if the Simulcast
Sites' customers win more than the Simulcast Sites are obligated
to pay the Debtors.  Conversely, the Simulcast Sites may owe
money to the Debtors when their customers win less than the
Simulcast Sites are obligated to pay the Debtors.  In addition,
the Simulcast Sites pay the Debtors a percentage of the total
amount wagered at their locations, a fee for the simulcast
service, and a fee for administering the pari-mutuel pools.
After deducting their fees, the Debtors pay the Simulcast Sites
the amounts owed for the winning tickets purchased through the
Simulcast Sites.

The Simulcast Sites commenced the instant adversary
proceeding, in which they seek to recover $7,307,298.75 allegedly
owed to them on account of money room settlements that were not
paid on races conducted pre-petition (the "Pari-mutuel Funds").
In the Complaint, the Simulcast Sites allege that they are
entitled to the balance of the Pari-mutuel Funds after the

4

Debtors have deducted their commissions and fees.  The Simulcast Sites contend that the funds are due to the Simulcast Sites for their commissions and fees and for sums that they paid to their customers for winning wagers made on races run at the Debtors' Host Tracks, including amounts paid to the IRS on the winning bettors' behalf as required by law.

The Simulcast Sites assert eleven causes of action in the Complaint, including: (i) a declaration that the Pari-mutuel Funds are not property of the Debtors' bankruptcy estate, (ii) an order requiring the Debtors to distribute the Pari-mutuel Funds to them, (iii) a declaration that the Pari-mutuel Funds are being held in constructive trust by the Debtors for the Simulcast Sites, (iv) a declaration that the Pari-mutuel Funds are being held by the Debtors as a bailment for the Simulcast Sites, and (v) a declaration that the Debtors have wrongfully converted the Pari-mutuel Funds.

The Debtors filed a motion to dismiss the Complaint on November 2, 2009.  The Simulcast Sites opposed the motion.  This matter has been fully briefed and is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (K) & (O).

III. <u>DISCUSSION</u>

The Debtors move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  <u>See</u> Fed. R. Bankr. P. 7012.

A.   <u>Rule 12(b)(6) Standard</u>

To survive a motion to dismiss, a complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009).  Rather, "a complaint must contain sufficient factual matter, accepted as true 'to state a claim to relief that is plausible on its face.'" <u>Id.</u> (<u>quoting</u> <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  Determining whether a complaint is facially plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  <u>Id.</u> at 1950.

The Third Circuit instructs courts to "conduct a two-part analysis.  First, the factual and legal elements of a claim should be separated.  The [reviewing court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-

6

11 (3d Cir. 2009).  The reviewing court "must then determine
whether the facts alleged in the complaint are sufficient to show
that the plaintiff has a plausible claim for relief."  Id. at
211.  In other words, a complaint must show that the plaintiff is
entitled to relief based on its facts.  Id.

    B.   Debtors' Motion to Dismiss

        1.   Property of the estate

The Simulcast Sites assert initially that the Pari-mutuel
Funds are not property of the Debtors' bankruptcy estate.  The
Bankruptcy Code defines property of the estate broadly to include
"all legal or equitable interests of the debtor in property as of
the commencement of the case."  11 U.S.C. § 541(a)(1).  Section
541(d) further provides, however, that "[p]roperty in which the
debtor holds, as of the commencement of the case, only legal
title and not an equitable interest . . . becomes property of the
estate . . . only to the extent of the debtor's legal title to
such property, but not to the extent of any equitable interest in
such property that the debtor does not hold."  11 U.S.C.
§ 541(d).  It is well-settled that "debtors 'do not own an
equitable interest in property . . . [they] hold[] in trust for
another,' and that therefore funds held in trust are not
'property of the estate.'"  City of Farrell v. Sharon Steel
Corp., 41 F.3d 92, 95 (3d Cir. 1994) (quoting Begier v. I.R.S.,
496 U.S. 53, 59 (1990)).  See also In re Columbia Gas Sys. Inc.,

7

997 F.2d 1039, 1059 (3d Cir. 1993) (stating that "the classic definition of a trust [is that] the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee."). Therefore, the bankruptcy estate retains legal title over a trust, "but the beneficiaries of the trust . . . may reclaim their equitable interests in the trust fund so created through bankruptcy court proceedings." Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc., 960 F.2d 366, 372 (3d Cir. 1992).

Funds that a debtor holds in trust are not property of the debtor's bankruptcy estate whether the trust is statutory or constructive. See Columbia Gas Sys., 997 F.2d at 1059 (stating that trust funds are excluded from a debtor's estate whether "held in express trust" or "in constructive trust."). See also Begier, 496 U.S. at 60 (holding that statutory trust funds were not property of the estate); Sharon Steel, 41 F.3d at 99 (stating that funds held in constructive trust are not property of the estate).

Generally, a statutory trust is created by the language of a statute. In re S & S Lumber Co. Inc., 178 B.R. 397, 399 (Bankr. M.D. Pa. 1995). In contrast, "a constructive trust is a judicial 'construct' [imposed] in order to remediate an inequity to a beneficiary." Id.

8

The Simulcast Sites assert that the Debtors lack an equitable interest in the Pari-mutuel Funds, because they are held in a statutory or constructive trust.  The Debtors counter that any trust created in the Pari-mutuel Funds is for the benefit of the winning bettors, not the Simulcast Sites; they contend that the Simulcast Sites only have a breach of contract claim against the estate, not any claim for trust funds.

The Debtors are correct in part only.  To the extent that the Simulcast Sites seek payment of fees and commissions due them under their contracts with the Debtors, the Court agrees that they are merely creditors and have failed to state a claim for imposition of a trust, conversion, or bailment for the reasons stated below.  However, to the extent the Simulcast Sites contend that they have paid the winning bettors who placed wagers at their locations, the Court concludes that the Simulcast Sites may be subrogated to the rights of the winning bettors and have stated a claim for imposition of a trust and bailment in the Pari-mutuel Funds.  See 11 U.S.C. § 509(a) (stating that "an entity that is liable with the debtor on . . . a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.").  See also Fisher v. The Outlet Co. (In re Denby Stores, Inc.), 86 B.R. 768 (Bankr. S.D.N.Y. 1988) (stating that the "doctrine of subrogation enables one who pays the debt of

9

another to stand in the shoes of the latter party and assert
whatever rights that party held.").

            a.   <u>Statutory trust</u>

    The Simulcast Sites rely on federal and state statutes in
arguing that they are the beneficiaries of a statutory trust over
the Pari-mutuel Funds.  The Simulcast Sites contend that the
statutory definitions of pari-mutuel and takeout make clear that
the Debtors' interest in the Pari-mutuel Funds is limited to the
Debtors' takeout fee, with the balance held in trust for the
benefit of the Simulcast Sites.

    The Debtors argue that the statutes do not address their
obligation to distribute money to the Simulcast Sites.  Rather,
the Simulcast Sites' entitlement to payment from the Debtors
arises only from their contracts.

    In order to establish a statutory trust, "an express
legislative intent to create a trust relationship must be found
in the statute."  <u>Am. Sav. & Loan Assoc. v. Weber (In re Weber)</u>,
99 B.R. 1001, 1009 (Bankr. D. Utah 1989).  <u>Compare</u> <u>Begier</u>, 496
U.S. at 60 (finding that a "trust for the benefit of the IRS
existed" where the federal statute provided, <u>inter alia</u>, that
"[w]henever any person is required to collect or withhold any
revenue tax from any other person and to pay over such tax to the
United States, the amount of tax so collected or withheld shall
be held to be a special fund in trust for the United States"),

10

with <u>Acuity, a Mut. Ins. Co. v. Planters Bank, Inc.</u>, 362 F. Supp. 2d 885, 891 (W.D. Ky. 2005) (finding that the state statutes did not impose a statutory trust because "[n]one of the statutes use the word 'trust' or the word 'fund.'").

In interpreting a statute, the Court must begin its analysis with the plain meaning of the statute.  <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526, 534 (2004) ("It is well established that 'when a statute's language is plain, the sole function of the courts – at least where disposition required by the test is not absurd – is to enforce it according to its terms.'") (<u>quoting</u> <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 6 (2000)).

i.   <u>State statutes</u>

The Simulcast Sites rely on the applicable state statutes (California, Maryland, Florida, and Pennsylvania) to support their assertion that a statutory trust in their favor exists. The Debtors argue that the relevant state statutes contemplate that pari-mutuel pool money is to be distributed to winning bettors but are silent as to distribution to off-track sites.

The definitions of pari-mutuel wagering under the relevant state laws are similar.  <u>See, e.g.</u>, Cal. Bus. & Prof. Code. § 19411 ("'parimutuel wagering' is a form of wagering in which bettors either purchase tickets of various denominations, or issue wagering instructions leading to the placement of wagers,

11

on the outcome of one or more horse races."); Fla. Stat. Ann. §
550.002(22) ("'Pari-mutuel' means a system of betting on races or
games in which the winners divide the total bet, after deducting
management expenses and taxes, in proportion to the sums they
have wagered individually and with regard to the odds assigned to
particular outcomes.").

The distribution requirements under the relevant state laws
are also similar.  <u>See</u> Cal. Bus. & Prof. Code. § 19411 (2008)
("The association distributes the total wagers comprising each
pool, less the amounts retained for purposes specified in this
chapter, to winning bettors based on the official race results");
Fla. Stat. Ann. §§ 550.155(3) & 550.002 (2010) (stating that
after deduction for takeout fees "a pari-mutuel pool must be
redistributed to the contributors," who are defined as "person[s]
who contribute[] to a pari-mutuel pool by engaging in any pari-
mutuel wager"); Md. Code Ann. Bus. Reg. § 11-514(b) (2010)
("[m]oney that remains after deductions are made under subsection
(a) shall be returned as winnings to successful bettors."); 4 Pa.
Cons. Stat. Ann. § 325.221(a)(8) (2010) ("all moneys remaining in
the wagering pools [after the statutory takeouts] shall be
distributed to the holders of winning tickets").

Based on the express language of the state statutes, the
Court concludes that there is a statutory trust in favor of the
winning bettors.  The state statutes describe the rights of

12

winning bettors vis-a-vis the race tracks, and it is clear that the Pari-mutuel Funds are held in trust by the Debtors for the winning bettors under the applicable state statutes.  See, e.g., City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 80 Cal. Rptr. 2d 329, 335 n.4 (Cal. Ct. App. 1998) (finding that statute at issue did impose a statutory trust where it stated that the money "shall be deemed to be held in trust by the county treasurer on behalf of the depositing entity or public official."); U.S. Fidelity & Guar. Co. v. Ernest Constr. Co., 854 F. Supp. 1545, 1562 (M.D. Fla. 1994) (concluding that the plain meaning of the statute expressly required that a party shall "hold such funds in trust . . . and shall not use such funds for any other purpose"); Ins. Co. of N. Am. v. Genstar Stone Prods. Co., 656 A.2d 1232, 1242 (Md. 1995) (statute at issue expressly stated that the money "shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials").  Therefore, the Court concludes that the Simulcast Sites have stated a claim for imposition of a statutory trust in the Pari-mutuel Funds to the extent they are subrogated to the rights of the winning bettors.

The Simulcast Sites, however, have not cited any state law provisions that would impose a trust for sums due them for commissions or fees under their contracts with the Debtors.  In fact, none of the statutes cited govern the relationship between

13

on-site tracks (Host Tracks) and off-track sites (Simulcast Sites).  Instead, the Simulcast Sites rely on section 19411 of the California Business and Professions Code which merely defines pari-mutuel wagering generally.  See Cal. Bus. & Prof. Code § 19411 (2008).  Article IX of the California Racing Law does legislate the treatment of off-track sites but does not establish that there is a trust in favor of the Simulcast Sites for funds that may be due them from the Host Tracks.  See Cal. Bus. & Prof. Code § 19602 (2008).

Similarly, under Florida law, the provisions cited by the Simulcast Sites merely provide that the Host Track shall distribute the wagers, after deducting takeout fees, to the Host Tracks' on-site costumers.  See Fla. Stat. Ann. § 550.155.  Again, the statutory treatment of off-track operators does not include any trust language.  See Fla. Stat. Ann. § 550.3551.

The Maryland statute cited by the Simulcast Sites also contains no language that establishes a trust in favor of the Simulcast Sites.  See Md. Code Ann. Bus. Reg. §§ 11-101(m), 11-514(b), 11-801, et seq. (2010).

Finally, the Pennsylvania law relied upon by the Simulcast Sites does not govern the treatment of off-track operators.  See 4 Pa. Cons. Stat. Ann. § 325.221(8) (2010).  There is no statutory authority for creating a trust in favor of off-track site operators.  Id. at § 325.101 et seq.  Notably, the

14

Pennsylvania legislature did create a statutory trust for other parties in its horse racing laws.  Id. at § 325.235(c) (stating that a "licensed corporation shall maintain a separate account, called a Horsemen's Account.  Money owing to owners in regard to purses, stakes, rewards, claims and deposits shall be deposited into the Horsemen's Account.  Funds in the account shall be recognized and denominated as being the sole property of owners.").  The absence of any similar provision in favor of off-track operators suggests that no trust was intended for them.

The Court concludes, therefore, that the Simulcast Sites have failed to state a claim for imposition of a statutory trust on the Pari-mutuel Funds for their fees or commissions because the relevant statutes contain no language which expressly creates such a trust in their favor.  See, e.g., Sharon Steel, 41 F.3d at 97 n.6 (stating that the "statute's plain language shows that the state is a creditor and 'not in the position of a beneficiary'") (citing In re Markos Gurnee P'ship, 163 B.R. 124, 131-32 (Bankr. N.D. Ill. 1993)).

## ii.  California's new statute

The Simulcast Sites also rely on a recently added provision to the California Racing Law as authority for finding that a trust exists in their favor for their fees and commissions.  The Simulcast Sites contend that the new provision, effective October 9, 2009, makes clear that the Pari-mutuel Funds are not property

15

of the Host Tracks.  They argue that the provision has

retroactive effect and governs the Pari-mutuel Funds that are the

subject of this adversary proceeding.

The newly added provision, titled "Distributions to be held

in trust until paid" provides that:

> A person licensed under this chapter to conduct a horse
> racing meeting shall hold in trust the distributions
> required to be made pursuant to this chapter until the
> funds are paid to the various distributees.  These
> required deductions, except for those that enure to the
> benefit of the racing association, are trust funds and
> shall not be used by the racing association for any
> purpose other than for payment to those distributees as
> directed by this chapter.  These funds are not the
> property of the racing association, but are merely held
> in trust for the benefit of the statutory distributees
> until the funds are distributed to them in accordance
> with this chapter.  These funds shall be held in a
> separate depository account until they are actually
> distributed as provided for in this chapter.

Cal. Bus. & Prof. Code § 19597.5 (2009).

The Simulcast Sites also cite section 1(a) of the preamble

of the statute for further support, which states:

> The Legislature finds and declares that it has been
> long established in California that the racing
> association and its pari-mutuel operation is actually
> only holding the stakes.  The funds wagered are not the
> property of the racing association.  The racing
> association merely holds the funds wagered until the
> results of the race are known, then the association
> pays the winning wagers, and holds funds for others
> pursuant to the California Horse Racing Law.  It has
> always been known that the funds due the various
> distributees are not the property of the racing
> association.  The racing association is merely acting
> as a trustee until the funds are paid to those as
> provided for in the statute.

2009 Cal. Legis. Serv. Ch. 226 (West).

The Simulcast Sites argue that the law has retroactive effect, based upon the following language: "It is therefore the intent of the Legislature that the purpose of this act is not to change California law, but merely to codify this trustee relationship."  Cal. Bus. & Prof. Code § 19597.5.  The California Horse Racing law states that "[t]he provisions of this chapter insofar as they are substantially the same as existing code provisions relating to the same subject matter shall be construed as restatements and continuations thereof, and not as new enactments."  Id. at § 19419.9.

The Debtors argue initially that the legislation has no bearing upon this proceeding, because it was not codified at the time of the races and there is a presumption against retroactive application of statutes.  See, e.g., McClung v. Employment Dev. Dept., 99 P.3d 1015, 1021 (Cal. 2004) (stating that generally a statute operates prospectively, unless "it contains express language of retroactivity or if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application.") (quoting Myers v. Phillip Morris Cos., Inc., 50 P.3d 751, 844 (Cal. 2002)).  The Debtors assert that the California Legislature "is well acquainted with these principles and uses clear language when it intends a statute to operate retroactively."  Bullard v. California State Automobile Assn., 28 Cal. Rptr. 3d 225, 229 (Cal. Ct. App. 2005).  The Debtors contend

17

that because the new provision does not contain the express
language sufficient to overcome the presumption against
retroactively applying the statute, it is not applicable to this
case.

The Court finds that section 19597.5 of the California
racing law does not establish a trust in favor of the Simulcast
Sites for their fees and commissions, even if the statute were
applied retroactively.  The Simulcast Sites' argument fails for
the same reasons discussed previously.  The newly added provision
states that the Pari-mutuel Funds are held by the Host Tracks "in
trust for the benefit of the statutory distributees."  Cal. Bus.
& Prof. Code § 19597.5 (2009).  The Simulcast Sites have not
cited any statutory language establishing that <u>they</u> are statutory
distributees.

As discussed previously, to the extent that the Simulcast
Sites are seeking reimbursement for money that they have paid to
(or on behalf of) winning bettors, they have stated a claim for
imposition of a statutory trust.  There is nothing in the new
law, however, that establishes that off-track sites are entitled
to the imposition of a trust on the Pari-mutuel Funds for their
fees and commissions.

iii. <u>Federal statute</u>

The Simulcast Sites also argue that the federal Interstate
Horse Racing Act (the "IHRA") creates a trust in their favor for

18

all sums owed.  15 U.S.C. § 3001 et seq.  They cite the provision in the federal statute that defines a pari-mutuel wagering system as "any system whereby wagers with respect to the outcome of a horserace are placed with, or in, a wagering pool conducted by a person licensed or otherwise permitted to do so under State law, and in which the participants are wagering with each other and not against the operator."  15 U.S.C. § 3002(13).  The statute also defines "takeout" as the "portion of a wager which is deducted from or not included in the parimutuel pool, and which is distributed to persons other than those placing wagers."  Id. at § 3002(20).

The statute is silent, however, as to who is entitled to the takeout.  Specifically, it does not establish any trust relationship between the entity that collects the wagers and any person to whom it must distribute the funds other than the winning bettors.  While the federal statute may create a trust in favor of the winning bettors, the Court concludes that it does not contain the express language necessary to create a statutory trust in favor of the Simulcast Sites for their fees and commissions.  Cf. Begier, 496 U.S. at 60.

### b.   Constructive trust

The Simulcast Sites also argue that they are entitled to a constructive trust under both federal and state law, because they are the intended recipients of the Pari-mutuel Funds as evidenced

by various horse racing laws and because of the Debtors' pre-
petition inequitable conduct in retaining the Pari-mutuel Funds.

i.   State constructive trust

The Simulcast Sites contend that they are entitled to a
constructive trust under applicable state law.  Under California
law, a constructive trust is imposed when the following elements
are satisfied: (1) a res exists; (2) the complaining party has
rights to that res; and (3) there has been some wrongful
acquisition or retention of the res by a party who is not
entitled to it.  Burlesci v. Petersen, 68 Cal. App. 4th 1062,
1069 (Cal. Ct. App. 1998).  Under Florida law, a constructive
trust is imposed when facts show "(1) a promise express or
implied, (2) transfer of the property and reliance thereon, (3)
confidential relationship, and (4) unjust enrichment."  Abreu v.
Amaro, 534 So. 2d 771, 772 (Fla. Dist. Ct. App. 1988).  Under
Maryland law a constructive trust may be imposed only "where
property has been acquired by fraud, misrepresentation, or other
improper method" and it is necessary to "prevent the unjust
enrichment of the title holder."  Dulany v. Taylor, 660 A.2d
1046, 1054 (Md. Ct. Spec. App. 1995).

The Debtors argue that the Simulcast Sites cannot show that
they are entitled to a constructive trust under any of the
applicable state laws.  The Debtors contend that the Simulcast
Sites have not alleged facts showing that the Debtors'

20

acquisition or retention of the Pari-mutuel Funds was wrongful, as required under California and Maryland law.  The Debtors further contend that the Simulcast Sites have not alleged that they enjoyed the confidential relationship with the Debtors with respect to their fees and commissions that is necessary under Florida law.  See In re Abrass, 268 B.R. 665, 678 (Bankr. M.D. Fla. 2001) ("To demonstrate a confidential relation, courts should examine whether 'influence has been acquired and abused' and whether 'confidence has been reposed and betrayed.'") (quoting Quinn v. Phipps, 113 So. 419, 422 (Fla. 1927)).

The Simulcast Sites respond that the retention of the Pari-mutuel Funds is wrongful because it is contrary to the distribution scheme in the racing statutes and contrary to statements made by the Debtors in their public filings with the SEC and in their promotional materials.  The Simulcast Sites argue that the Debtors' representations were falsely made to induce wagering and investments in the Debtors' public stock. Therefore, the Simulcast Sites contend that the Debtors obtained money upon a false premise or representation which constitutes the improper conduct sufficient to support a claim for constructive trust.

The Court concludes that the Simulcast Sites' have stated a claim for a constructive trust under state law for any claims they may have as subrogees of the winning bettors but not for

their direct claim for fees and commissions.  The Debtors have
wrongfully retained the Pari-mutuel Funds to the extent they
represent sums due to the winning bettors because the federal and
state racing statutes, the Debtors' public filings with the SEC,
and their promotional materials all require that the funds due to
the winning bettors be paid to them.

With respect to the monies due to the Simulcast Sites for
fees and commissions, however, the Debtors acquired the Pari-
mutuel Funds in accordance with applicable statutes and their
retention of monies due to the Simulcast Sites for fees and
commissions is not violative of those statutes nor the result of
any wrongdoing or misrepresentation.  Further, the parties'
contracts did not require that the Debtors segregate the Pari-
mutuel Funds pending payment to the Simulcast Sites.  Rather, the
Debtors were merely obligated to pay the Simulcast Sites from
their general funds at the end of the meet or the end of the
month when the money room settlements were reconciled.

Therefore, the Court concludes that the Simulcast Sites'
claim to the funds for their fees and commissions is simply a
general unsecured claim against the Debtors' estates.  See, e.g.,
In re KI Liquidation, Inc., No. 08-611, 2008 WL 5109369, *5-6
(D.N.J. Dec. 1, 2008) (holding that breach of contractual
obligations does not constitute the wrongful act necessary to
create a trust, even where the debtor collects funds from one

entity and has an obligation to pass them on to a third party);
Fox v. Shervin (In re Shervin), 112 B.R. 724, 734 (Bankr. E.D.
Pa. 1990) (finding no trust existed and funds were property of
the estate where settlement agreement failed to provide an
"identified res of money, put apart and held separately" and
permitted the debtor "to pay the sums due, on the date they were
owed, from whatever source he chose."). See generally 5 Collier
on Bankruptcy ¶ 541.11, at 541-59 (Lawrence P. King, et al.,
eds., 15th rev. ed. 2000) ("Where the recipient of . . . funds
can by agreement use them as the recipient's own and commingle
them with the recipient's own monies, a debtor-creditor
relationship exists, not a trust.").

                    ii.  Federal constructive trust

     Federal common law provides for a more expansive definition
of a constructive trust. Columbia Gas Sys., 997 F.2d at 1056.
While state law typically imposes a constructive trust "only if
wrongdoing has resulted in unjust enrichment," wrongdoing is not
a requirement under federal common law. Id. Rather, a
constructive trust is imposed under federal common law "when an
entity acts as a conduit, collecting money from one source and
forwarding it to its intended recipient." Id. Federal common
law only applies, however, where compelling "federal interests"
are at stake. Butner v. U.S., 440 U.S. 48, 55 (1979) (stating
that property interests are defined by state law, unless there is

                              23

a federal interest that mandates a different result).

### 1.    Compelling federal interest

The Debtors argue that there are no compelling federal interests at stake in this case and that, therefore, state law (not federal common law) applies.  See, e.g., Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20 (2000) (stating that the basic rule "in bankruptcy is that state law governs the substance of claims . . . ."); Barnhill v. Johnson, 503 U.S. 393, 397-98 (1992) (concluding that "in the absence of any controlling federal law, 'property' and 'interest[s] in property' are creatures of state law.") (quoting McKenzie v. Irving Trust Co., 323 U.S. 365, 370 (1945)).

The Simulcast Sites argue that federal common law applies here because there are several "federal interests" at stake.  The Simulcast Sites argue, for example, that their relationship with the Debtors is governed in part by the IHRA, a federal statute. 15 U.S.C. § 3000 et seq.  They argue that the IHRA fosters interstate pari-mutuel wagering by creating a uniform system. The Simulcast Sites argue that IHRA protects interstate bettors and simulcast sites by ensuring that the commissions received by host tracks are non-discriminatory.

The Debtors respond that the IHRA itself recognizes that state law governs this dispute.  15 U.S.C. § 3001 ("[T]he States should have the primary responsibility for determining what forms

24

of gambling may legally take place within their borders."). Because the IHRA recognizes the states' primacy in the field, the Debtors argue that the statute cannot as a matter of law be the basis for finding that there exists a compelling interest to apply federal common law.  See, e.g., Columbia Gas Transmission Corp. v. Exclusive Natural Gas Storage Easement, 962 F.2d 1192, 1197 (6th Cir. 1992) (declining to apply federal common law where the federal statute provided that courts "should look to the 'practice and procedure' of the state" thereby raising a "strong presumption" that state law applied.).

The Simulcast Sites argue, however, that the Third Circuit has held that there is a strong federal interest in preventing the frustration of the underlying purpose of section 541 of the Bankruptcy Code.  See, e.g., Columbia Gas Sys., 997 F.2d at 1056 (stating that application of state law on trusts would frustrate the congressional intent to exclude from property of the estate property that the debtor collects on behalf of another).

The Debtors argue that Columbia Gas Sys. is inapplicable because in that case the dispute involved funds that arose directly as a result of federal law.[2]  In contrast, here the IHRA does not specifically mandate that the Debtors collect and transfer any money to the Simulcast Sites.

---

[2]  In Columbia Gas Sys., the Federal Energy Regulatory Commission instituted a program that required the debtor to pass money from a third party to its consumers.  997 F.2d at 1055-56.

The Debtors also dispute the Simulcast Sites' contention that section 541(d) is sufficient to mandate the use of federal common law.  Rather, they argue that a claim for constructive trust is generally based on state law.  See, e.g., Fluor Enters., Inc. v. Orion Refining Corp. (In re Orion Refining Corp.), 341 B.R. 476, 483 (Bankr. D. Del. 2006) (holding that federal common law would not apply because the claimants' entitlement to a constructive trust was based upon state law as there was "no nationally uniform law . . . at stake and no federal program at issue.").

The Third Circuit requires that a court apply a three prong test to determine whether federal common law or state law should apply.  Columbia Gas Sys., 997 F.2d at 1055 (citing U.S. v. Kimbell Foods, Inc., 440 U.S. 715, 727-28 (1979)).  A court should consider: (1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern.  Kimbell Foods, 440 U.S. at 727-28.

The Debtors contend that the IHRA explicitly recognizes that state law retains primacy and that state law facilitates the objectives of the federal program by preventing "interference by one State with the gambling policies of another."  15 U.S.C.

26

§ 3001.  They argue that commercial expectations would be upset if state law did not govern state property rights.

In this case, the Court concludes that federal common law is available to the extent that the Simulcast Sites' claim is premised on their claims as subrogees of the winning bettors. The IHRA does establish a uniform law by mandating that pari-mutuel funds be forwarded to the winning bettors whether they are in-state or out-of-state.  15 USC § 3001(a)(3).  Allowing the Debtors to retain the Pari-mutuel Funds which represent sums due to winning bettors would frustrate the federal objective of the IHRA which defines pari-mutuel wagering as being one wager against all other wagers and would upset the expectations of those betting on horse races.  Kimbell Foods, 440 U.S. at 727-28. Further, the Court finds that there is a compelling federal policy to assure that debtors do not retain funds in which they have only legal title while others have the beneficial title.  11 U.S.C. § 541(d).  See, e.g., Columbia Gas Sys., 997 F.2d at 1056. Consequently, the Court will consider whether the Simulcast Sites have stated a claim for a constructive trust under federal common law.

2.  Federal common law

A constructive trust is imposed under federal common law "when an entity acts as a conduit collecting money from one source and forwarding it to its intended recipient."  Id.  See

27

also In re Penn Central Transp. Co., 486 F.2d 519, 523-27 (3d
Cir. 1973).

The Simulcast Sites argue that the Debtors received the
Pari-mutuel Funds from bettors at the Host Tracks for the sole
purpose of redistribution, after deducting the takeout fees, to
winning bettors and to the Simulcast Sites.  In support of their
position, the Simulcast Sites rely upon the various state racing
statutes discussed earlier.  By refusing to distribute the Pari-
mutuel Funds now, the Simulcast Sites contend that the Debtors
have converted their legal pari-mutuel wagering into illegal
"betting against the house."  In addition, the Simulcast Sites
argue that the Debtors admitted they have no ownership interest
in the Pari-mutuel Funds when they stated in their public
financial statements and promotional materials that they would
pay the winning bettors.

The Debtors argue that the Simulcast Sites cannot recover
under a federal constructive trust theory but admit that the
winning bettors are beneficiaries under the statutes.  They
argue, however, that the statutes are silent as to any obligation
to distribute money to the Simulcast Sites.  The Debtors argue
that the Simulcast Sites merely enjoy breach of contract claims
against the Debtors' estate.

As discussed previously, the Court agrees with the Debtors'
assertion that the statutes do not address the Debtors'

obligation to reimburse the Simulcast Sites for their fees and commissions. However, the Court does find that the Simulcast Sites have stated a claim under federal common law for recovery of the Pari-mutuel Funds to the extent that they were paid to the Debtors as a conduit for payment of the winning bettors whom the Simulcast Sites have paid.

c.   Tracing

To establish that there exists a trust, a plaintiff must "identify and trace the trust funds if they are commingled." Goldberg v. N.J. Lawyers' Fund for Client Protection, 932 F.2d 273, 280 (3d Cir. 1991). The Debtors contend that the Simulcast Sites have not alleged that the funds were segregated. Rather, the Simulcast Sites are only able to make a claim against the Debtors' general estate, which is insufficient to show any nexus to the alleged trust funds. Chao v. Lexington Healthcare Group, Inc. (In re Lexington Healthcare Group, Inc.), 335 B.R. 570, 577 (Bankr. D. Del. 2005) (stating that where funds are commingled the "Plaintiff must show some nexus between the withheld funds and the funds on which it seeks to impose a trust.").

The Supreme Court discussed what qualifies as a nexus in the Begier case. 496 U.S. at 64-66. In that case, the funds in question had already been paid, and the Court concluded that the payment was "sufficient to establish the required nexus between the amount held in trust and the funds paid". Id. at 67.

29

However, the Court recognized that courts should "permit the use
of reasonable assumptions" and that "[o]ther rules might be
reasonable, too." Id.

The Debtors argue that the Simulcast Sites have not pled
sufficient facts to establish that they can trace the purported
trust funds to any funds that the Debtors now hold.

The Simulcast Sites contend that the nexus issue is not
subject to a determination as a matter of law on a motion to
dismiss prior to discovery.  Rather, the Simulcast Sites argue
that they are entitled to prove a nexus through discovery of the
Debtors' internal records or through applying "reasonable
assumptions," including the lowest intermediate balance test.
Sharon Steel, 41 F.3d at 102-13; Columbia Gas Sys., 997 F.2d at
1063 ("When a trustee commingles trust funds with other monies in
a single account, the lowest intermediate balance rule aids
beneficiaries in tracing trust property.").  Further, the
Simulcast Sites argue that the nexus requirement should be
liberally interpreted, as it should be "determined in light of
all circumstances," after "an examination of the commercial
realities of how the Debtors conducted business" and taking into
consideration "the broader policy against allowing a party
unilaterally to make a trust unenforceable by commingling
assets." EBS Pension LLC v. Edison Brothers Stores, Inc. (In re
Edison Brothers, Inc., 243 B.R. 231, 239 (Bankr. D. Del. 2000)

(quoting Sharon Steel, 41 F.3d at 102 n.10).

The Court agrees with the Simulcast Sites.  As described earlier, pari-mutuel pools are a collection of data representing the amounts and types of bets placed with respect to a race. Thereafter, a money room settlement is created to document what is due to the winning bettors and what is due in takeout fees. Therefore, it is plausible that the Simulcast Sites would be able to satisfy the nexus requirement by tracing the funds or by applying, inter alia, the lowest intermediate balance test. Consequently, the Court will deny the Debtors' motion to dismiss the statutory and constructive trust claims to the extent the Simulcast Sites assert they are entitled to the Pari-mutuel Funds for payments made by or on behalf of the winning bettors.

2.  Bailment

The elements of a bailment are: (1) delivery of personal property by one person to another to be used for a specific purpose, (2) acceptance of that delivery, and (3) an express or implied contract that the purpose will be carried out and that the property will then be returned or dealt with as otherwise directed.  19 Williston on Contracts § 53:2 (4th ed. 2009).  See also John T. Handy Co. v. Carman, 648 A.2d 1115, 1121-23 (Md. Ct. Spec. App. 1994); McKell v. Washington Mutual, Inc., 29 Cal. Rptr. 227, 254-55 (Cal. Ct. App. 2006); S&W Air Vac Sys., Inc. v. Dep't of Revenue, 697 So. 2d 1313, 1315 (Fla. Dist. Ct. App.

31

1997).

The Simulcast Sites argue that they have alleged the
elements of a bailment, because the Pari-mutuel Funds were
transferred to the Debtors for the specific purpose of making
distributions to them.  They argue that the purpose is clear from
applicable law, past practice, the Debtors' financial statements
and promotional material.  The Simulcast Sites contend that it is
clear that the bettors never intended that their wagers be kept
by the Debtors.

The Debtors argue that the Simulcast Sites' bailment claims
are insufficient to withstand the motion to dismiss.  The Debtors
contend that there must be an agreement that establishes a
bailor-bailee relationship and that the Simulcast Sites have not
identified any contractual language that suggests that the
parties intended a bailment.  Further, the Debtors argue that it
is undisputed that the Simulcast Sites did not deliver the
property to the Debtors; rather, the funds were given to the
Debtors by bettors at the Host Tracks.

The Simulcast Sites counter that a bailment can arise for
the benefit of a third party through the delivery of property for
a particular purpose.  See, e.g., Papi Exp., Inc. v. Dosal
Tobacco Corp., 677 So. 2d 1314, 1315 (Fla. Dist. Ct. App. 1996)
(bailment occurs where there is "delivery of personalty for some
particular purpose, or on mere deposit, upon a contract . . .

32

that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions . . . .") (quoting Monroe Sys. for Bus. Inc. v. Intertrans Corp., 650 So. 2d 72, 75-76 (Fla. Dist. Ct. App. 1994)).  The Simulcast Sites contend that the bettors contributed to the Pari-mutuel Funds for the express purpose of wagering against, and for redistribution to, other bettors and the Simulcast Sites.

The Debtors admit that the delivery requirement is met when a bailor delivers property to the bailee for the benefit of a third party.  Nonetheless, they argue that here the bettors did not place wagers for the benefit of the Simulcast Sites.  They note that nothing in the Complaint alleges that individual bettors intended that their wagers be held for the benefit of the Simulcast Sites.

The Court agrees with the Simulcast Sites that there was a delivery of personal property to the Debtors by the bettors with the express expectation that it would be redistributed to the winning bettors at both the Host Track and at the Simulcast Sites.  Therefore, the Court concludes that the Simulcast Sites have stated a claim for a bailment for funds due to the winning bettors who were paid by the Simulcast Sites.

3.    Conversion

The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of a certain piece of property; (2) the defendant's conversion of the property by wrongful act or disposition of property rights; and (3) damages. See, e.g., Farmers Ins. Exch. v. Zerin, 61 Cal. Rptr. 2d 707, 709 (Cal. Ct. App. 1997); Warshall v. Price, 629 So. 2d 903, 904 (Fla. Dist. Ct. App. 1993) ("Conversion is an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein."); Allied Inv. Corp. v. Jasen, 731 A.2d 957, 963 (Md. 1999) ("Conversion is any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.").

The Debtors contend that the Simulcast Sites' conversion actions must be dismissed because the Simulcast Sites had no right to immediate possession of the funds at the time of the alleged conversion. See, e.g., In re Ames Dept. Stores, Inc., 274 B.R. 600, 629 (Bankr. S.D.N.Y. 2002) (finding no conversion where parties' agreement gave "no right to immediate possession" of the proceeds from the sale of merchandise and the plaintiff was "paid at regular intervals from general funds . . . not the identical funds from the sale of merchandise."). See also Zerin, 61 Cal. Rptr. 2d at 709 ("A party need only allege that it is 'entitled to immediate possession at the time of conversion.' . .

34

. However, a mere contractual right of payment, without more, will not suffice.") (quoting Bastanchury v. Times-Mirror Co. 68 Cal. App. 2d 217, 236 (Cal. Ct. App. 1945)); Nat'l Ventures, Inc. v. Water Glades 300 Condo. Ass'n, 847 So. 2d 1070, 1073 (Fla. Dist. Ct. App. 2003) (stating that a conversion action requires that the plaintiff be "entitled to possession, at the time of the conversion"); Ginsberg v. Lennar Florida Holdings, Inc., 645 So. 2d 490, 499 (Fla. Dist. Ct. App. 1994) (finding that conversion action was improper because plaintiff did not establish that it had right to immediate possession of rents and therefore defendant faced liability only on a breach of contract claim, but not for tortious conversion); Smith v. Rosenthal Toyota, Inc., 573 A.2d 418, 422-23 (Md. Ct. Spec. App. 1990) (stating that a plaintiff must "have the right to immediate possession of the item converted").

In this case, the Debtors contend that the parties' contract did not give the Simulcast Sites the right to immediate possession nor required that the Debtors segregate the funds pending the money room settlement. Instead, the net amount owed to either the Debtors or the Simulcast Sites was to be resolved periodically (either at the end of the meet or monthly).

The Simulcast Sites argue that the Debtors are liable for conversion because they have no ownership rights in the Pari-mutuel Funds and have refused to make the money room settlements

35

at the time required by the contracts.

The Court agrees with the Debtors that a claim for conversion has not been stated.  The Simulcast Sites have not set forth facts evidencing that they were contractually entitled to immediate possession of any specific funds.  See, e.g., PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th 384, 395 (Cal. Ct. App. 2007) (holding that "[m]oney cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved."); Allied Inv. Corp., 731 A.2d at 966 (stating that "[t]he general rule is that monies are intangible and, therefore, not subject to a claim for conversion."); Belford Trucking Co. v. Zagar, 243 So. 2d 646, 648 (Fla. Dist. Ct. App. 1970) (finding that money may be the subject of a conversion claim only if "it consists of specific money capable of identification.").

In this case, the Simulcast Sites were not entitled to any specific cash held by the Debtors.  Instead, they were entitled to a claim for the net result of comparing the wagers/winning bettors at the Host Tracks with the wagers/winning bettors at the Simulcast Sites.  Therefore, the Court will grant the Debtors' motion to dismiss the conversion claims.

36

IV.   <u>CONCLUSION</u>

    For the reasons set forth above, the Court will grant in part and deny in part the Defendants' Motion for an Order Dismissing the Second Amended and Restated Complaint filed by the Plaintiffs.

    An appropriate Order is attached.


Dated: September 20, 2010          BY THE COURT:

                                   Mary F. Walrath
                                   United States Bankruptcy Judge